UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CROSSFIT, INC., : | |
| : | Civ. No. 2:13-1108 (KM) |
| Plaintiff, : | |
| : | |
| v. : | MEMORANDUM OPINION |
| : | |
| 2XR FIT SYSTEMS, LLC, JAY : | |
| ALVAREZ, and DOES 1–10. : | |
| : | |
| Defendants. : | |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff, CrossFit, Inc. ("CrossFit"), asserts three causes of action related to infringement of its trademark. This matter comes before the Court on CrossFit's unopposed Motion for Default Judgment against Defendants 2XR Fit Systems, LLC ("2XR") and Jay Alvarez (Docket No. 9), pursuant to Fed. R. Civ. P. 55(b)(2). The summons and complaint were duly served, no answer or motion was filed in response, and the clerk entered default on May 20, 2013.

Before me now are CrossFit's supplemental briefing and proof of damages. For the reasons set forth below, I find that entry of a default judgment is appropriate. I will enter judgment for compensatory damages and also grant CrossFit's request for an injunction against further infringement of its trademark and domain name.

## I. BACKGROUND

CrossFit is a Delaware corporation principally engaged in the business of fitness training and consultancy. CrossFit owns several registered United States trademarks and service marks including the term "CrossFit." Docket No. 1 ("Compl.") at 2; Compl., Exh. A ("U.S. Service Mark Registration"). Defendant Alvarez is a resident of New Jersey and Defendant 2XR is a New Jersey Limited Liability Company.[1] *Id.* Alvarez is the sole owner of 2XR. *Id.* ¶ 8.

On February 25, 2013, Plaintiff filed a three-count Complaint, alleging

---

[1] "On information and belief," Plaintiff alleges that Alvarez is a New Jersey resident residing in either Lyndhurst or North Arlington, New Jersey and that 2XR's principal place of business is in Lyndhurst, New Jersey. Compl. ¶¶ 6, 7.

claims of Trademark Infringement, pursuant to 15 U.S.C. Section 1114; False Designation of Origin, pursuant to 15 U.S.C. Section 1125(a); and Cyberpiracy, pursuant to 15 U.S.C. Section 1125(d). Plaintiff requested the entry of judgment in its favor in the form of compensatory damages, injunctive relief, and attorneys' fees and costs. Compl. at 11–12.

CrossFit alleges that Alvarez, through his company 2XR, offered fitness training services under the names "2XR Cross Fitness," "2XR Xross Fitness," and "2XR Bootcamp Cross Fitness," and that he registered a domain name of www.2xrbootcampcrossfitness.com. *Id.* ¶ 14–15. CrossFit alleges that Defendants used these infringing terms in advertising their fitness training services, leading to customer confusion. This, according to CrossFit, was a deliberate attempt by Defendants to make their services and goods look as if they originated from a licensed CrossFit affiliate or certified trainer. *Id.* ¶ 20.

Defendants 2XR and Alvarez were personally served with the Complaint, summons, and accompanying exhibits on April 4, 2013. Docket Nos. 5, 6. Pursuant to Fed. R. Civ. P. 12(a)(1), Defendants had twenty-one days to respond to the complaint; the time to respond expired on April 25, 2013. Defendants have failed to answer or otherwise respond to the Complaint. On September 4, 2013, Plaintiff requested that the Clerk enter default pursuant to Fed. R. Civ. P. 55(a). On May 20, 2013, the Clerk entered default against 2XR Fit Systems, LLC and Jay Alvarez. On June 14, 2013, Plaintiff filed a Motion for Default Judgment as to both named Defendants. Docket No. 9.

In an abundance of caution, on January 7, 2014, I issued an Order to Show Cause why the Court should not enter default judgment in CrossFit's favor (Docket No. 10). I also requested that CrossFit submit documentary and sworn proof of damages. All such papers were to be submitted on or before January 27, 2014, and were to be personally served.[2] Plaintiff timely filed supplemental briefs and accompanying exhibits in support of its Motion for Default Judgment, Docket No. 11. Defendants were given until February 10, 2014, to file opposition papers. Defendants did not respond and have not otherwise appeared in this Court.

---

[2] On February 13, 2014, CrossFit filed Declarations of Diligence stating that, after a due and diligent effort, CrossFit was unable to personally serve Defendants with CrossFit's supplemental briefing. Docket Nos. 12, 13. According to these declarations, Defendants' landlord stated that they disappeared overnight three to four months ago and Defendants' business premises (a gym) were empty.

2

## II. DISCUSSION

### A. Entry of Default Judgment

"[T]he entry of a default judgment is left primarily to the discretion of the district court.") (citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951)). Because the entry of a default judgment prevents the resolution of claims on the merits, "this court does not favor entry of defaults and default judgments." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984). Thus, before entering default judgment, the Court must determine whether the "unchallenged facts constitute a legitimate cause of action" so that default judgment would be permissible. *DirecTV, Inc. v. Asher*, 03-cv-1969, 2006 WL 680533, at *1 (D.N.J. Mar.14, 2006) (citing Wright, Miller, Kane, 10A Federal Practice and Procedure: Civil 3d § 2688, at 58–59, 63).

"[D]efendants are deemed to have admitted the factual allegations of the Complaint by virtue of their default, except those factual allegations related to the amount of damages." *Doe v. Simone*, CIV.A. 12-5825, 2013 WL 3772532, at *2 (D.N.J. July 17, 2013). While "courts must accept the plaintiff's well-pleaded factual allegations as true," they "need not accept the plaintiff's factual allegations regarding damages as true." *Id.* (citing *Chanel, Inc. v. Gordashevsky*, 558 F.Supp.2d 532, 536 (D.N.J. 2008)). Moreover, if a court finds evidentiary support to be lacking, it may order or permit a plaintiff seeking default judgment to provide additional evidence in support of the allegations. *Doe*, 2013 WL 3772532, at *2.

Before a court may enter default judgment against a defendant, the plaintiff must have properly served the summons and complaint, and the defendant must have failed to file an answer or otherwise respond to the complaint within the time provided by the Federal Rules, which is twenty-one days. *See Gold Kist, Inc. v. Laurinburg Oil Co., Inc.*, 756 F.2d 14, 18–19 (3d Cir. 1985); Fed. R. Civ. P. 12(a).

Here, Defendants Alvarez and 2XR were properly served and have failed to respond to the Complaint. They also failed to respond to the Court's Order to Show Cause why default judgment should not be entered in Plaintiff's favor. And they failed to respond to Plaintiff's supplementary proofs of damages. Accordingly, I am satisfied that the prerequisites to filing a default judgment are met. *See Gold Kist, Inc.*, 756 F.2d at 18–19.

I must now evaluate the following three factors: (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default. *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987)). The factors weigh in favor of entry of a default judgment.

1. Whether Defendants have a Meritorious Defense

As to the first factor, I am disadvantaged, of course, by the lack of any submission by Defendants Alvarez and 2XR. I am satisfied that Plaintiff has stated claims for relief. Accepting the factual allegations as true, as I must, it appears that Plaintiff has stated claims for Trademark Infringement; False Designation of Origin; and Cyberpiracy. My independent review of the record does not suggest that Plaintiff's claims are legally flawed or that there is a meritorious defense to them. *See Doe*, 2013 WL 3772532, at * 5; *see also Coach, Inc. v. Bags & Accessories*, CIV.A. 10-2555 JBS-J, 2011 WL 1882403, at *6 (D.N.J. May 17, 2011) ("Because the Defendants did not respond, the Court cannot determine whether the Defendants had meritorious defenses that are not reflected in the record.").

a. Trademark Infringement and False Designation of Origin

To state a claim for both trademark infringement, 15 U.S.C. § 1114(1)(a), and false designation of origin, 15 U.S.C. § 1125(a)(1), a plaintiff must show three elements: "(1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards").

Here, CrossFit has provided evidence of the first and second elements. That evidence consists of trademark registrations establishing ownership of a valid and legally protectable mark. Docket Nos. 9-5, 9-6. A "certificate of registration issued by the United States Patent and Trademark Office constitutes prima facie evidence of the validity and ownership of a disputed mark" and is therefore sufficient to establish the first and second elements of trademark infringement and false designation claims. *Coach, Inc. v. Cosmetic*

4

*House*, CIV. 10-2794 WHW, 2011 WL 1211390, *2 (D.N.J. Mar. 29, 2011). CrossFit also alleges that it has continuously used the marks at issue. Compl. ¶ 12. I am satisfied that the first two elements are met here.

As to the third element, a "likelihood of confusion" exists where "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Coach, Inc. v. Cosmetic House*, 2011 WL 1211390, at *3 (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991)). Courts consider a variety of factors when assessing whether two marks are likely to cause consumer confusion. In this Circuit these factors include, but are not limited to

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other factors suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 471 (3d Cir. 2005) (quoting *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983)). The Third Circuit has "repeatedly insisted that the *Lapp* factors are not to be mechanically tallied, but rather that they are tools to guide a qualitative decision." *A & H Sportswear, Inc.*, 237 F.3d at 216. Upon such a review of these factors, I find that the Defendants' use of the allegedly infringing marks is likely to cause consumer confusion.

"The single most important factor in determining likelihood of confusion is mark similarity." *Id.* Plaintiff submits that the terms "Cross Fitness" and "Xross Fitness" are extremely similar to "CrossFit." On the limited record before me, I cannot disagree. Marks are confusingly similar if "ordinary consumers would likely conclude that [the two products] share a common source,

5

affiliation, connection, or sponsorship." *Id.* (quoting *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994)). Where the goods or services are in direct competition, as is the case here, the degree of similarity required to prove likelihood of confusion is less than is required for dissimilar products. *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 713 (3d Cir. 2004) (citation omitted). Here, Defendants have used strikingly similar variations of the "CrossFit" to promote services that appear to be the same, or at least similar, to the services offered by CrossFit-certified trainers and affiliates.[3] I find that the marks are substantially similar and, therefore, likely to cause confusion to an unsuspecting consumer.

Plaintiff also argues that the marks are strong marks. To evaluate this factor, a court must "examine: (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (factual evidence of marketplace recognition)." *Freedom Card, Inc.*, 432 F.3d at 472 (citation omitted). "The conceptual strength of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the weakest: "(1) arbitrary or fanciful (such as "KODAK"); (2) suggestive (such as "COPPERTONE"); (3) descriptive (such as "SECURITY CENTER"); and (4) generic (such as "DIET CHOCOLATE FUDGE SODA")." *Id.* To determine commercial strength, courts examine the marketplace recognition of the trademark.

I find that CrossFit is conceptually and commercially strong. The mark is certainly not merely descriptive or generic. At the very least, CrossFit is a suggestive mark, requiring "the consumer to use imagination, thought, or perception to determine the character of the goods or service." *Harlem Wizards Entm't Basketball, Inc. v. NBA Properties, Inc.*, 952 F. Supp. 1084, 1093 (D.N.J. 1997). Because it is not quite, like KODAK, "a coined term that does not exist in the English language," it may not be fanciful; "Cross" (as in cross training) and "Fit" are real terms associated with exercise and health. But their combination into a single unique word, with the "F" unconventionally capitalized, at least places the mark in the "suggestive" category. *See Mine O'Mine, Inc. v. Calmese*, 2:10-CV-00043-KJD, 2011 WL 2728390, at *5 (D. Nev. July 12, 2011), *aff'd*, 489 F. App'x 175 (9th Cir. 2012). Further, CrossFit offers

---

[3] Further, as CrossFit submits, it does not negate similarity that Defendants adds "2XR Boot Camp" to the "Cross Fitness" mark because CrossFit-licensed affiliates themselves are differentiated by words added to the CrossFit marks. For instance, current licensed affiliates operate under the marks "Transform CrossFit in Pennington, NJ" and "CrossFit Live Fast in Avon, NJ." Docket No. 9-1 at 8.

proof of the mark's commercial strength. For example, the "CrossFit Games" are broadcast internationally by ESPN, and a CrossFit commercial aired during the 2012 Super Bowl. A May 2013 Bloomberg article, Docket No. 9-4, Exh. A, reported on the swell in popularity of CrossFit. Accordingly, I am satisfied that the CrossFit mark is both conceptually and commercially strong.

As to the third factor (purchasers' care and sophistication), I do not think that relevant consumers—presumably the general health-conscious public—would exercise such heightened care as to preclude a finding of violations of these Lanham Act claims. *See Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 186 (3d Cir. 2010) (reasoning that where "the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations," but "where the group of buyers is a combination of professionals and ordinary consumers, the class as a whole is not held to the higher standard of care") (internal quotations and citation omitted).[4]

In regard to the fifth factor, the evidence presented by CrossFit does suggest that Defendants intended to confuse customers. There is evidence that they traded on the goodwill of the CrossFit marks by using their similar marks on their website and in social media. *See A & H Sportswear, Inc.*, 237 F.3d at 225-26 (holding that "defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's"). Here, Defendants' use of "Cross Fitness" and "Xross Fitness" is not likely to be unintentional. Because Defendants have adopted a similar mark and were offering the same services as CrossFit, it is plausible that Defendants' intent was to confuse

---

[4] The fourth and sixth factor, the length of time the defendant has used the mark without evidence of actual confusion arising and the evidence of actual confusion, may tend to weigh in favor of consumer confusion, but the Record before the Court is inconclusive. Though evidence of actual confusion is not required, such evidence is "highly probative of a likelihood of confusion." *Sabinsa Corp.*, 609 F.3d at 187. Here, CrossFit submits that Defendants have likely offered fitness services from at least November 2011, the date upon which Defendants began using the allegedly infringing domain name. Because Defendants have not appeared in this case, CrossFit has not had the opportunity to conduct discovery as to actual consumer confusion. CrossFit does offer evidence, in the form of online consumer reviews on the "Yelp!" website, Docket No. 9-16, Exh. M. One review notes that Alvarez is "not certified in anything," and another states "hopefully you don't get scammed as well as the last 20 women in Lydhurst [NJ] did." This evidence is not overwhelming, but in light of Defendants' two-year use of the mark and the absence of evidence that consumers were *not* confused, these factors are at worst neutral.

customers in order to profit from the goodwill associated with the well-known CrossFit brand.

     I also find that the seventh, eighth, and ninth factors, which address the "nature of the services provided, the customers targeted, and the methods used to reach those customers," *Primepoint, L.L.C. v. PrimePay, Inc.*, 545 F. Supp. 2d 426, 444 (D.N.J. 2008) (addressing these factors together), weigh in CrossFit's favor. The "greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." C*heckpoint Sys., Inc. v. Check Point Software Technologies, Inc.*, 269 F.3d 270, 288–89 (3d Cir. 2001). "When the parties target their sales efforts to the same group of consumers, there is a greater likelihood of confusion between two marks."

     CrossFit's evidence suggests that it and the Defendants use similar advertising and marketing media: the internet and social media. The services they offer are described very similarly. CrossFit promotes a "training paradigm based on constantly varied, high-intensity, functional movement performed in small gym environments." Docket No. 9-2 ("Brenner Decl.") ¶ 4. Defendants promoted a training program similar to CrossFit's. *See* Docket Nos. 9-9 through 9-16, Exhs. F–M. Finally, it does not appear that the parties target their sales efforts to different consumers. The parties operate in the same industry and offer similar fitness services at the retail level. It is therefore reasonable to believe that consumers would be confused by Defendants' use of the marks and would believe Defendants to be associated with CrossFit.

     Upon review of the relevant factors, I find that the there is a likelihood that customers would be confused by the Defendants' use of the marks. I therefore find CrossFit's claims of trademark infringement and false designation of origin under the Lanham Act to be legally sufficient.

### b. Cyberpiracy

     Finally, I will address Plaintiff's claim for Cyberpiracy, pursuant to 15 U.S.C. Section 1125(d). The Anticybersquatting Consumer Protection Act ("ACPA") makes it "illegal for a person to register or to use with the 'bad faith' intent to profit from an Internet domain name that is 'identical or confusingly similar' to the distinctive or famous trademark or Internet domain name of another person or company." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing 15 U.S.C. § 1125(d)). CrossFit alleges that Defendants engaged in cyberpiracy by registering a domain name consisting of CrossFit marks,

"www.2xrbootcampcrossfitness.com." *See* Docket No. 9–8, Exh. E. ("Go Daddy domain registration").

To state a cyberpiracy claim, CrossFit must prove that: (1) its mark is a distinctive or famous mark entitled to protection; (2) the Defendants' domain names are "identical or confusingly similar to" CrossFit's mark; and (3) Defendants registered the domain names with the bad faith intent to profit from them. *See Shields*, 254 F.3d at 482. As to the first element, the Third Circuit has considered the following factors when determining whether a mark is distinctive or famous:

> (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties.

*Id.* (citing 15 U.S.C. § 1125(c)(1)).

As I determined above in connection with the trademark claims, the CrossFit marks are distinctive and well known. Plaintiff has submitted evidence that "CrossFit" is recognized internationally, and that consumers readily associate the CrossFit mark with CrossFit's business and services. For example, 70,000 competitors from 73 counties participated in the CrossFit games in 2012. Brenner Decl. ¶ 4. The CrossFit website has received at least 35 million "hits" per year from 2011 to the present and has over 500,000 Facebook "likes." CrossFit protects its mark through trademark and service mark registration and owns several registered United States trademarks and service marks including the word "CrossFit," including registered U.S. Service Mark Registration No. 3,007,458, issued on October 18, 2005. Compl. ¶ 12. CrossFit's marks have been in continuous use in commerce beginning, at the latest, on the date of the 2005 registration and continuing to the present. CrossFit alleges that Defendants began offering fitness training services using infringing marks in or around November 2011. *Id.* ¶ 14. In light of the foregoing, I find that the CrossFit marks were distinctive at the time of Defendants' registration of their domain name.

9

I also find that Defendants' domain name is "confusingly similar to" CrossFit's mark because of Defendants' use of the phrase "crossfitness" in their domain name "www.2xrbootcampcrossfitness.com." (This prong relates to the nature of the domain name itself, not to the likelihood of confusion by consumers.) *Pennsylvania Bus. Bank v. Biz Bank Corp.*, 330 F. Supp. 2d 511, 525 (E.D. Pa. 2004) (citing *Shields*, 254 F.3d at 483). Though the domain name is not identical to the CrossFit mark, it is confusingly similar to the CrossFit mark and to CrossFit's website, www.crossfit.com. *See Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002) (holding that registration and/or use of the "louisvuitton-replicas.com" domain name constituted cybersquatting pursuant to 15 U.S.C. Section 1125(d) upon motion for default judgment).

The final element plaintiff must prove is that Defendants acted with a bad faith intent to profit from plaintiff's mark. Section 1125(d)(1)(B)(i) provides a non-exhaustive list of nine factors for a court to consider when assessing this element:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the

time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

*Shields*, 254 F.3d at 485.

CrossFit asserts that by inserting "crossfitness" into the domain name, Defendants intended to pirate the goodwill attached to the CrossFit marks. Again, I am disadvantaged in assessing Defendants' intent because they have not appeared, but their noncooperation will not inoculate them against adverse inferences. I am satisfied that there is sufficient evidence from which to infer that Defendants intended to profit from CrossFit's goodwill.

Defendants' conduct satisfies a number of the factors enumerated above. Based on the record before me, Defendants have never used the infringing domain name as trademarks or service marks, and therefore have no intellectual property rights in the domain name (factor I). The domain name does not contain a variation of Defendants' legal name or any name commonly used to identify them (factor II). It does not appear that Defendants have ever used this domain name for the bona fide offering of goods or services or for a non-commercial or "fair use" purpose (factors III and IV). It also may be inferred, without any evidence to the contrary, that Defendants deliberately maintained the website to divert customers from CrossFit's website (factor V). I have already established that the CrossFit mark is distinctive (factor IX).[5]

The evidence discussed above in connection with trademark infringement is highly suggestive of bad faith. CrossFit adds that it commenced this case only after Defendants disregarded cease and desist letters. On October 1, 2012, CrossFit sent an email to Defendants demanding that they stop using the term "Cross Fitness." Compl., Exh. D. Receiving no response to the email, CrossFit sent a formal cease and desist letter to Defendants on January 3, 2013. Compl., Exh. E. Again, no response. CrossFit representatives made phone calls to Defendants as well, but got no substantial response. *See N. Light Tech., Inc. v. N. Lights Club*, 236 F.3d 57, 65 (1st Cir. 2001) (upholding district court's finding of bad faith based, in part, on defendants' history of disregarding cease-

---

[5] Factors VI–VIII do not seem to be implicated here.

11

and-desist letters from legitimate trademark owners).[6]

I find that CrossFit's cyberpiracy claim is legally sufficient.

### 2. Prejudice suffered by the party seeking default

Second, I am persuaded that Plaintiff would suffer prejudice if default judgment were denied. Defendants were properly served eleven months ago, yet failed to appear or defend themselves in any manner. *See Teamsters Pension Fund of Philadelphia & Vicinity v. Am. Helper, Inc.*, CIV. 11-624 JBS/JS, 2011 WL 4729023, at *4 (D.N.J. Oct. 5, 2011). Given Defendants' past infringement, refusal to offer and explanation or justification, and potential for future infringement, I find that Plaintiff would suffer ongoing financial harm and prejudice if a default judgment were denied. It would be inequitable to allow Defendants to preclude Plaintiff's requested relief by simply failing to appear.

### 3. Culpability of the party subject to default

Third, absent any evidence to the contrary, "the Defendant's failure to answer evinces the Defendant's culpability in its default. There is nothing before the Court to show that the Defendant's failure to file an answer was not willfully negligent." *Teamsters Pension Fund of Philadelphia & Vicinity*, 2011 WL 4729023, at *4 (citing *Prudential Ins. Co. of America v. Taylor*, No. 08–2108, 2009 WL 536403 at *1 (D.N.J. February 27, 2009) (finding that when there is nothing before the court to suggest anything other than that the defendant's willful negligence caused the defendant to fail to file an answer, the defendant's conduct is culpable and warrants default judgment)). Defendants were served with the complaint back on April 4, 2013. Docket Nos. 5–6. By Order to Show Cause, they have been afforded an additional opportunity to respond to Plaintiff's application for a default judgment. Defendants have not responded in any manner. Indeed they seem to have absconded. The obvious conclusion is that they are culpable for this failure and unable to offer a plausible defense.

Accordingly, I find that the entry of a default judgment is appropriate.

---

[6] It is also worth noting that Defendants, for unexplained reasons, registered the domain name under the name of "Darlene Lowry." This may signal consciousness of infringement or cyberpiracy. Docket No 9-1, Exh. E.

B. Remedies

Pursuant to this Court's Order to Show Cause, Docket No. 10, CrossFit has submitted supplemental briefing and other papers in support of their request for damages and injunctive relief. Docket No. 11. Defendants have not responded. I will therefore rule based on the record before me.

i. Injunctive Relief

CrossFit requests that the Court enter a permanent injunction against Defendants enjoining them from any further infringement of the CrossFit marks or cyberpiracy of its domain name.

The Supreme Court requires that any plaintiff seeking a permanent injunction to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006) (citations omitted). The Court may issue a permanent injunction in the context of a default judgment where these requirements are met. *See Coach, Inc. v. Ocean Point Gifts*, CIV.A.09-4215 JBS, 2010 WL 2521444, at *10 (D.N.J. June 14, 2010). As to the Lanham Act in particular, there is specific statutory authorization for permanent injunctive relief to prevent or restrain trademark infringement. 15 U.S.C. § 1116. I find that a permanent injunction is warranted here.

First, I find that Plaintiff would suffer irreparable injury if Defendants were to continue and/or resume use of the CrossFit marks. This Circuit has recognized that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will." Kos *Pharm., Inc.*, 369 F.3d at 726 (quoting *Pappan Enters., Inc. v. Hardee's Food Sys.*, Inc., 143 F.3d 800, 805 (3d Cir. 1998)). Further, "trademark infringement amounts to irreparable injury as a matter of law." *Id.* (quoting *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992)).

According to CrossFit's supplementary submission, Defendants appear to

have abandoned their allegedly infringing website as of November 21, 2013. Docket No. 11 at 1. They also appear to have abandoned their Facebook page and removed all videos from their YouTube page. Some evidence of infringement remains on the Groupon website. Defendants did not alert CrossFit that the sites were removed. Defendants' cessation of infringing activities may represent no more than a tactical retreat; they have never acknowledged the infringement or attempted to justify it, and have never so much as responded to a cease and desist letter. There is every reason to think they will resume infringing once they are no longer under the shadow of litigation.

I also find that an injunction is appropriate here because monetary damages are inadequate to compensate CrossFit for trademark infringement and cyberpiracy. *See Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990) (reasoning, in the context of a preliminary injunction, that "[g]rounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will"). If Defendants were to resume the infringing activity, CrossFit would again face a threat to its reputation and goodwill. While the monetary relief provided, as discussed below, will largely compensate CrossFit for the injury incurred to this point, it will not protect it against future infringement. *See Coach, Inc. v. Bags & Accessories*, CIV.A. 10-2555 JBS-J, 2011 WL 1882403, at *9 (D.N.J. May 17, 2011) (citation omitted) (concluding that while "a remedy at law would provide a degree of monetary relief," it would "not compensate for the injury" to plaintiff's "reputation or necessarily prevent future trademark infringement"). More broadly, a plaintiff is not required to simply let the infringement continue, periodically refreshing its demand for damages; it may rightly demand that the infringement stop.

In balancing the hardships, I find that equity indeed warrants the relief Plaintiff seeks. Defendants will not be unduly burdened by an injunction. The only "hardship" imposed upon Defendants is that they refrain from engaging in unlawful conduct. *Id.* Finally, I find that the public interest would not be disserved by issuing an injunction. To the contrary, the public can only benefit from the cessation of infringement. There is no public interest served by consumer confusion, and there is a public interest in truth and accuracy in the marketplace. *See Kos Pharm., Inc.*, 369 F.3d at 730.

Accordingly, I will grant Plaintiff the following injunctive relief:

Defendants, individually and collectively, for themselves and their

14

principals, partners, agents, servants, employees, independent contractors, and all persons in active concert and participation with them shall be permanently restrained and enjoined from infringing upon the "CrossFit" trademarks and from using any confusingly similar terms, in any manner, including but not limited to the following activities:

1. Offering, providing, or purporting to offer or provide fitness classes or fitness training using the "CrossFit" name, and/or any confusingly similar terms, including but not limited to Cross Fitness, Xross Fitness, and XFit;

2. Using the "CrossFit" name, and/or any confusingly similar terms, including but not limited to Cross Fitness, Xros Fitness, and XFit, on their websites (including but not limited to text in meta-tags), blogs, social media profiles business directories and listings, advertisements, promotional materials, and third-party sites where company information is submitted by Defendants regarding their personal training services, and at their facilities;

3. Registering, using, or selling any trademark, trade name, or domain names with the formative "CrossFit," and/or any confusingly similar terms, including but not limited to Cross Fitness, Xross Fitness, and XFit, and from encouraging or assisting any third party to do the same, in connection with any goods or services related or similar to those of CrossFit.

### ii. Damages

In addition to a permanent injunction, Plaintiff CrossFit requests that the Court enter a judgment awarding it damages and profits in the amount of $468,933.78, statutory damages in the amount of $100,000.00, attorney's fees in the amount of $17,608.50, and costs in the amount of $905.00. CrossFit submits that awarding these remedies is supported by the Lanham Act and the Federal Rules.

### b. Damages and Profits Attributable to Infringement

Pursuant to 15 U.S.C. Section 1117(a), a plaintiff prevailing on claims for trademark infringement and false designation of origin may recover damages sustained and disgorgement of profits resulting from the infringement. 15 U.S.C. § 1117. Actual damages include injury to a plaintiff's goodwill, including injury to the business's reputation. Treble damages may also be awarded in the

Court's discretion.[7] The award of treble damages is warranted only where there is some evidentiary basis for actual damages. *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 273 (3d Cir. 1975).

*Profits*. CrossFit submits that Defendants' profits, at a minimum, equal the 5 Groupon membership sales (valued at $79.99 for each sale, totaling $399.95), Docket No. 11, Exh. 3, plus 432 other monthly memberships (valued at $179.99, totaling $77,755.68), *id.*, Exhs. 4, 5. This number is derived from Defendants' now-removed Facebook site, on which 437 people indicated that they appeared in person at Defendants' facilities, minus the 5 Groupon sales.[8] The profits, therefore, total, at a minimum, $78,155.63. *See* 15 U.S.C. § 1117 ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.").

*Trebling*. Plaintiff also requests that the $78,155.63 profits figure be trebled. The statute allows that, "in assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117. The Court may award treble damages "if the infringement is wilful or intentional." *Travelodge Hotels, Inc. v. Meridian Global Investments, LP*, CIV. 11-2599 WHW, 2012 WL 2341466, *7 (D.N.J. June 15, 2012).

Here, I will infer willfulness, as Defendants continued their infringing activity even after notifications to cease and desist using the CrossFit marks. The activity, however misleading, does fall short of actual counterfeiting. And Defendants appear to have operated a relatively small business, and have largely ceased the infringing behavior (to be sure, a year after the initial demand, and nearly nine months after the commencement of this suit). *See id.* (awarding treble damages based on intentional infringement "because Defendants continued to use Travelodge Marks despite receiving cease and

---

[7] The statute provides:

In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.

15 U.S.C. § 1117.

[8] CrossFit contends that this estimate is conservative, as there may well be customers who did not indicate via Facebook that he or she appeared at the gym.

desist letters from THI"). As a result, I will not impose the maximum penalty of trebling; I will double the lost profits damages, adding on an another $78,155.63.

*Loss of Goodwill.* CrossFit requests damages for injury to its goodwill. It argues that it is only reasonable to assume that Defendants' use of the CrossFit marks caused some consumers to believe that CrossFit condoned Defendants' business practices. CrossFit has not proffered any economic or expert evidence, and it admits that quantifying this damage is difficult in the absence of discovery and expert analysis. CrossFit suggests that the court assess loss-of-goodwill damages equal to three times Defendants' profits, or $234,466.89. In support of this request, CrossFit submits that Defendants' business has received negative attention from social media in the form of "Yelp!" reviews. Docket No. 9-16, Exh. M. I will deny this component of damages. I do not require mathematical certainty, but I see no particular correlation at all between the dollar amount of lost goodwill and the trebling of Defendants' profits. The evidence submitted is simply too speculative a basis for loss-of-goodwill damages.

### c. Statutory Damages under Cyberpiracy Statute

Under 15 U.S.C. Section 1125(d), a court "has 'discretion to award statutory damages it "considers just" within a range from $1,000 to $100,000 per infringing domain name.'" *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 585 (E.D. Pa. 2002) (citing *Shields*, 254 F.3d at 487); *see Shields*, 254 F.3d at 481–82. Defendants' use of the CrossFit marks was surely intended to confuse consumers. Defendants' behavior, although wrongful, falls short of actual counterfeiting. *See Louis Vuitton Malletier & Oakley, Inc.*, 211 F. Supp. 2d at 585 (awarding maximum statutory damages where "Defendants' egregious acts in blatantly using Plaintiff Louis Vuitton's registered trademark to sell counterfeit Louis Vuitton products"). And these Defendants, apparently relatively small players in the industry, seem to have abandoned the domain name. I will therefore stop short of the maximum. I award Plaintiff $70,000 in statutory damages.

### d. Attorneys' Fees and Costs

"Reasonable attorney's fees may be awarded in exceptional cases; exceptional cases include those where the Court has made a finding of willfulness." *Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 539 (D.N.J.

17

2008) (citations omitted); *see* 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party"). The Third Circuit has indeed held that "a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringement, before a case qualifies as 'exceptional.'" *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 47 (3d Cir. 1991) (citing 15 U.S.C. § 1117(a)).

As discussed above, Defendants' conduct constitutes willful infringement. I will award reasonable attorney's fees in the amount of $17,608.50. *See* Docket No. 11-7, Exh. 6 (attorneys' fees log). I will also award CrossFit costs (including $227.50 in estimated costs associated with the current submission) in the amount of $905.00. *See* 15 U.S.C. § 1117(a) (allowing for the award of costs); *see also* Fed R. Civ. P. 54; *St. Paul Fire & Marine Ins. Co. v. AVH Trucking LLC*, CIV.A. 07-4802 (WHW), 2008 WL 4601771, at *5 (D.N.J. Oct. 15, 2008) ("Pursuant to Federal Rule of Civil Procedure 54(d)(1), costs other than attorney's fees should be allowed to the prevailing party on a motion for default judgment.").

### III. CONCLUSION

For the foregoing reasons, default judgment will be entered in favor of Plaintiff CrossFit in the amount of $244,824.76, plus injunctive relief. Judgment will be filed separately.

_____
**KEVIN MCNULTY**
**United States District Judge**